Filed 1/12/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B322762 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA103080) |
| v. | |
| ALEXANDER ALBERTO FRIAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jared D. Moses and Dorothy L. Shubin, Judges. Reversed and remanded with directions.

Law Offices of Jason Szydlik and Jason Szydlik for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

————————

Alexander Alberto Frias appeals from a judgment of conviction after the jury found him guilty of stalking. On appeal, Frias contends the trial court, in denying his four requests to substitute the Castaneda Law firm as his counsel, violated his Sixth Amendment right to counsel of his choice. The trial court did not abuse its discretion in denying Frias's first three requests to substitute in the Castaneda firm because the firm's attorneys were not ready for trial and the case had been pending for three years, during which time four different attorneys had handled Frias's defense at his request. But denial of Frias's fourth request was an abuse of discretion.

At the time of the fourth request, the case had been pending for three-and-a-half years, the case was set for trial as a six of 10 date, and the prosecutor and deputy public defender had announced ready for trial. This time, however, an attorney from the Castaneda firm announced he was ready for trial, subject to a few witness scheduling issues (the same issues the deputy public defender had). We recognize the trial court was concerned in light of the history of the case that the Castaneda firm's attorneys would seek a further continuance to prepare for trial once the firm was appointed, or that Frias on the day of trial would yet again seek to substitute in new counsel. But nothing in the record shows that the Castaneda firm was not prepared for trial, and the court did not make a further inquiry to confirm its suspicion the firm was not ready. Accordingly, absent any support in the record, the court's concerns were not sufficient grounds on which to deny Frias's request to have retained counsel of his choice. If the Castaneda firm's attorneys later requested a continuance or Frias requested new counsel, the court retained the discretion to deny the requests. And

regardless of whether the court believed the deputy public defender or Castaneda firm attorneys would do a better job in defending Frias, that was Frias's choice to make. We therefore reverse the judgment based on the trial court's denial of Frias's right to counsel of his choice.

We also review the sufficiency of the evidence to determine whether Frias may be tried again for stalking. We conclude substantial evidence supports Frias's conviction, and we remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Evidence at Trial*

In 2017 Courtney C. received a friend request on her Facebook account from Frias, which she denied because she did not know him. Frias posted comments on Courtney's Facebook "time line" and photographs she had posted. Courtney deleted Frias's posts and blocked him approximately 10 times, thinking the posts were from "a troll." Despite her efforts to block Frias, he continued to post on her account. By the summer of 2017, Frias posted on Courtney's account every couple of weeks.

On February 13, 2018 Courtney found flowers on her car at work. Courtney thought a former student who had visited that day left the flowers. She took a photograph of the flowers and posted it on Facebook. When Courtney came home, she placed the flowers in a vase on her kitchen counter.[1] Courtney did not post a picture of the flowers. On February 14 she received a

---

[1] Courtney lived in a third-floor apartment that faced her building's gated parking lot. A person could look into her apartment from the parking lot.

3

Facebook post commenting on the flowers in the vase. Courtney testified she was "[t]errified" because "this person who [she] thought was a nobody . . . was actually a real person and knew [her] or somehow knew . . . that [she] had gotten flowers." Courtney again blocked Frias.

On February 16, 2018 Courtney received a Facebook message from Frias that read, "I am so sorry if I spooked you in any way at all. I sat back and thought about all the random stuff I've been doing and wow, just wow. I would love for you to be around in my life in some sort of way, but if not, shit, no big deal, dam[n]. You have my number, if and when you ever feel like contacting me it would be awesome[.] I'm pretty sure you'[re] not spooked, but I swear I'm just a regular dude, kinda boring also, sometimes deep, sometimes, but if not, like I said no big deal. I am sorry, I got super super super on one about you, and I felt like I had a deep connection with you and like I knew you my whole life. It's probably cause we're a couple of valley kids that grew up around the same time. . . ." Courtney was concerned the person who posted on Facebook knew where she worked and that she "grew up in the valley."

On March 1, 2018 Frias posted another message on Courtney's Facebook account: "You may not feel the same, but being brokenhearted and longing for someone is fucking beautiful. It's what my favorite songs are about. It's who I am. Thanks for making me a part of this exclusive—I'm assuming that's exclusive—club again. I love this feeling. Nothing like it. Till we meet again." Courtney did not know what Frias meant by "till we meet again" because she had never met him. Her "anxiety started to grow," and the statement "really scared" her.

4

At 3:00 a.m. on March 10, 2018 Frias knocked on Courtney's apartment door and announced himself by name. Courtney threatened to call the police. By the time the police officers arrived, Frias had left. Approximately an hour later, Frias followed up with a long post on Courtney's Facebook account stating that "cops are three-quarter retarded" and "[w]e are connected on a deeper level and I can't fucken stop this shit." He made other statements that again showed he had been watching her, including that she watched a lot of movies, she changed her hairstyle, she wore a poncho and a bandana on separate occasions, and she owned a white car. He continued, "[U]gly guys stalk, I'm an admirer from afar, and I'm tired of it." Frias concluded, "Please just show me the real you. To be honest tonight was an awesome start." Courtney testified that when she read Frias's message, her "hand was shaking so much that [her] friend had to take the phone out of [her] hand." Courtney added, "And the police obviously didn't scare him" because he "wrote this right after they left."

On the afternoon of March 10 Courtney's mother Amanda sent Frias a text message stating she was "'trying to reach Alexander Albert.'" On March 13 at approximately 10:27 p.m. Amanda received a response to her text message stating, "'Meet me downstairs so you can suck this dick.'" Amanda assumed Frias believed he was writing to Courtney and that he was at the gate to Courtney's apartment complex. When Courtney learned about Frias's response, she "didn't feel safe" and "was terrified" because it was "happening again like he said it would." Courtney was a block or two away from her apartment and drove back to her apartment complex. She stayed in her car and called the police.

5

At approximately 10:55 p.m. the police arrived and found Frias sitting in the building's parking lot. The police officers detained him, and at some point Frias shouted, "'Courtney, baby, love me.'"

B.  *The Verdict and Sentencing*

The jury found Frias guilty of felony stalking. (Pen. Code, § 646.9, subd. (a).)[2] On August 1, 2022 the trial court imposed and suspended Frias's sentence, placed him on formal probation for two years, and ordered him to serve 192 days in county jail with 192 days of credit for time served. The court also issued a 10-year protective order requiring Frias not to contact Courtney and to stay at least 100 yards away from her.

Frias timely appealed.

## DISCUSSION

A.  *The Trial Court Abused Its Discretion in Denying Frias's Final Request for Substitution of Counsel*

1.  *Trial court proceedings*

On May 10, 2018 deputy public defender Jeffrey Graves represented Frias at the preliminary hearing. On October 25, 2018 the trial court granted Frias's request to substitute in Mark Melnick as his attorney.

At the August 23, 2019 hearing, Melnick stated Frias was requesting the court relieve him and appoint the public defender. Melnick added, "I would say we have reached an impasse in our

---

[2]  Further statutory references are to the Penal Code.

relationship, and there is a conflict at this point." The trial court[3] granted Frias's request and appointed the public defender's office (deputy public defender Noah Cox) as counsel. The court informed Frias, "You have the right to have counsel of your choice, and if you want to have the public defender, I will reappoint them. However, I express my concern that this case has been pending for a year with your private counsel. You had the public defender for three months, [then] pending for a year with Mr. Melnick. I express my concern that this may be for purposes of delay. But I am reappointing the public defender."

On November 4, 2019 Frias requested Amber Gordon be substituted in as his attorney. The trial court granted Frias's request but again expressed concern about Frias's "conduct going back and forth with different attorneys when he's already been admonished about this."

On October 1, 2020 the prosecutor and Gordon announced they were ready for trial. The trial court set October 6 as the trial date. However, on October 6 Gordon declared a doubt as to Frias's mental competence, and the court suspended the criminal proceedings.

On December 3, 2020, while court proceedings were suspended, Gordon informed the trial court that Frias was requesting new counsel, which Gordon supported because of a breakdown in communication. The court expressed its belief that Frias was "trying to manipulate the process in this case by just refusing to communicate with his attorney." But in light of the

---

[3]     Judge Dorothy L. Shubin presided over the pretrial hearings, including Frias's requests for substitution of attorney.

7

conflict, the court granted Frias's request to substitute Matthew Cargal in as his attorney.

Frias failed to appear in court on the morning of January 4, 2021. When the trial court inquired about Frias's whereabouts, Cargal responded that he had "made numerous attempts to contact [Frias] since the last court date" but had not spoken to him since December 16, 2020. Frias appeared in court later that morning. Cargal moved to withdraw as counsel on the basis Frias made it difficult for Cargal to represent him, and further, Frias said he could not pay Cargal's fees. The court granted Cargal's motion and, at Frias's request, reappointed the public defender's office (Cox).

On April 5, 2021 a psychiatrist submitted a written report opining that Frias was competent to stand trial. On April 9 the trial court found Frias was competent to stand trial and reinstated the criminal proceedings.

On June 23, 2021 Frias requested that Sergio Castaneda from the Castaneda firm be substituted in as Frias's counsel. The trial court asked Castaneda if he was "ready to go to trial within the period." Castaneda responded he was ready but was hoping to have time to review some issues with the defense expert. The court again asked, "Are you ready to go to trial within the period? Zero of 20?" Castaneda answered, "Zero of 20, I would say no."[4] The court then inquired whether Castaneda

---

[4]     Under section 1382, subdivision (a)(2), a criminal case must be dismissed absent good cause, with specified exceptions, where a defendant is not brought to trial within 60 days of arraignment on an indictment or information, or reinstatement of criminal proceedings. Under  section 1382, subdivision (a)(2)(B), which provides for a limited time waiver, a case shall not be dismissed if

had reviewed the discovery. Castaneda replied, "I have reviewed some, but I do have the file now from [Cox] who sent this over to me about an hour ago. So I will have more once I review that."[5]

The trial court denied Frias's request, stating, "[T]his case has been pending for years with repeated change of counsel by Mr. Frias. And I am hearing that Mr. Cox will be close to announcing ready. He's just finalizing an expert report. The timing of new counsel's readiness is highly unclear. And I find that this request to substitute is a delay tactic." Castaneda responded that he was asking for no more time than Cox would need, and therefore, "there would be no further delays." The court replied, "I don't really see how you are in a position to represent that since you haven't received all of the discovery." The court added, "Aside from that . . . my primary concern here is . . . Mr. Frias with the pattern of constantly coming in with new

---

"[t]he defendant requests or consents to the setting of a trial date beyond the 60-day period." Further, "[w]henever a case is set for trial beyond the 60-day period by request or consent, expressed or implied, of the defendant without a general waiver [of the 60-day requirement], the defendant shall be brought to trial on the date set for trial or within 10 days thereafter." (*Ibid*.) Where defendants give only a limited time waiver of the 60-day limit, trial courts typically set a trial date as a "zero of 10" date for trial, meaning that the case must be dismissed if not brought to trial within the 10-day period, absent the defendant's consent or a showing of good cause. (*People v. Superior Court (Arnold)* (2021) 59 Cal.App.5th 923, 936.) We assume the court, in referring to a "zero of 20," was inquiring whether the attorney would be ready for trial within 20 days.

[5] Cox confirmed he had provided the entire record to the Castaneda firm.

9

attorneys when this case is so old.  And he keeps hiring new counsel and going back to the public defender.  And virtually every time he's been here, the court expresses a concern about the age of the case and the need to move the matter forward.  So for all these reasons, the court denies the request."  The court continued the case to July 19, 2021 as day zero of 10 for trial.

On July 19, 2021 Frias requested Edward Yim from the Castaneda firm be substituted in as his attorney.  Yim stated, "[O]ur office would be prepared to address both the *Pitchess*[6] motions and . . . continue the process of having the expert evaluation completed.  Our office has been in communication with Mr. Frias's current attorney, and it is our intent to not cause any further delays if our motion to substitute is granted."  The trial court noted "the information was filed on May 25, 2018" and "[t]he case is over three years old."  The court denied the request, explaining, "I do recognize that with the *Pitchess* [motions] being filed that that will need to be determined, and the court will need to grant a short continuance on that basis.  But given the age of the case, the procedural history, all of the findings the court has previously made, and the fact that a defendant's right to counsel, obviously is exceptionally important, counsel of his choice, but it's not absolute, and the court is within its discretion to deny a continuance to secure new counsel.  And for all the reasons stated today, as well as the various dates when the court has previously made findings, the court denies the request.  It would cause delay

---

6    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.  Cox filed both a *Pitchess* motion and a supplemental *Pitchess* motion to obtain information on the District Attorney's prosecution of one of the police officers who responded to Courtney's 911 call on March 13, 2018.

in the case and appears to the court to be for the purposes of delay." The court continued the case to August 4, 2021 as day zero of 20 for trial.

At the August 25, 2021 hearing, Cox stated that Yim was present and Frias was again requesting to substitute in the Castaneda firm as counsel. The court denied the request, stating, "[T]here's a very long history of the court granting Mr. Frias the opportunity of different counsel, but the court finds this is for the purposes of delay. . . . [The case] has been set for trial until the issue of the *Pitchess* came up. So although the court understands and appreciates the right to counsel of choice, that right is not absolute. It's necessarily limited by countervailing state interests and proceeding with prosecution on an orderly, expeditious basis." The court continued the case to September 22, 2021 as day zero of 20 for trial.

On September 22, 2021 Frias informed the court that Yim was present in court to substitute in as counsel for Frias. Yim responded that his office was "not seeking to substitute in" that day and "was not planning to address the court." Yim added, "However, at a future date, as Mr. Cox referenced, perhaps after the *Pitchess* issues have been resolved . . . we plan to then seek to appear and will seek to substitute in as counsel." The court again continued the case for trial.

At the November 30, 2021 hearing, which was day zero of six for trial, Cox raised concerns whether the Burbank police officers who responded to Courtney's 911 calls would be available for trial. The prosecutor and Cox subsequently informed the court that they had spoken to the four police officers, and the officers agreed to be on call for trial. Cox also informed the court that the defense expert witnesses, Drs. Crandall and Walker, had

11

not responded regarding their availability for trial.[7] Cox added that the prosecutor had agreed to allow Dr. Crandall to "testify via Webex" (videoconference) and "[w]hile waiting to hear back from Dr. Crandall, I would, nonetheless, expect to be ready." The court stated, "It sounds like you're announcing ready, just provided that the expert confirms . . . that she will be available during the applicable time period." Cox answered, "Yes." The prosecutor confirmed she was ready for trial and had "agree[d] to have Dr. Crandall appear via Webex."

After the trial court ordered the parties to report to another courtroom for trial, Cox told the court that Frias wanted Yim and the Castaneda firm to represent him. Yim stated, "Mr. Frias has retained our office and is desirous of having us represent him in this matter. And it is not our intention to cause any additional delays in this matter." The trial court asked, "Are you saying your office is ready for trial?" Yim answered, "We have been in communication with Mr. Cox and his office and also close communication with Mr. Frias as well." The court stated, "That's not the same as saying you're ready for trial." Yim responded, "At this time, your honor, we are ready for trial. Subject to the scheduling that was discussed on the record earlier with the experts and things like that. But I'm sure—it sounded like everything got addressed." The court queried Yim, "How is it that you can represent you're ready for trial if—have you conferred with experts or any witnesses?" Yim responded, "We have—I've been in consultation with Mr. Cox during the preparation of this trial." After further discussion, the court

---

[7]    Cox intended to call either Dr. Crandall or Dr. Walker at trial depending on which defense expert was available.

12

repeated it had "grave concerns about readiness as well as the age of the case."

The prosecutor expressed her "concern . . . that if the substitution is granted and Mr. Yim sees the full case, that all of a sudden there will be a request for a continuance. . . . I don't want a last minute, well, I didn't know about this or now that I'm in charge, I want this expert or something to further delay this case." The court responded, "Well, that's my concern as well, as the court has stated on numerous occasions previously." Frias stated, as he had at prior hearings, "I would like the Castaneda Law Firm and Edward Yim to represent me in this case." The court denied Frias's request "on the grounds that this will result in a delay, and, hence, is a delay tactic."

The trial court recounted that it had granted numerous requests by Frias to substitute in new counsel, including Melnick, Cox, Gordon, and Cargal. The court continued, "Ultimately, the public defender was reappointed at Mr. Frias's request. Then Mr. Frias had an attorney Sergio Castaneda appear, he thought, to substitute in. That was over half a year ago, and the court at that time found it was a request for purposes of delay. Since that time, Mr. Cox has remained on the case. The court has observed the massive amount of work he's done in terms of *Pitchess* motion, discovery on *Pitchess*, follow-up on *Pitchess*. So there's a large volume of material there, as well as obtaining a number of different expert reports and opinions. So he's fully prepared, and it's time for the case to proceed to trial without further delay."

Jury selection commenced on December 6, 2021.

2.	*A defendant's right to choose counsel*

"The Sixth Amendment right to counsel guarantees a criminal defendant the right to choose his or her own counsel when the defendant does not need appointed counsel." (*People v. Woodruff* (2018) 5 Cal.5th 697, 728 (*Woodruff*), citing *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144 (*Gonzalez-Lopez*); accord, *People v. Verdugo* (2010) 50 Cal.4th 263, 310-311 (*Verdugo*) ["The right to retained counsel of choice is—subject to certain limitations—guaranteed under the Sixth Amendment to the federal Constitution."].)

"'In California, this right "reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain."'" (*People v. O'Malley* (2016) 62 Cal.4th 944, 1004; accord, *Verdugo*, *supra*, 50 Cal.4th at p. 311; see *People v. Courts* (1985) 37 Cal.3d 784, 789-790 (*Courts*) [criminal defendant has right to replace appointed counsel with retained counsel of choice].) "'The right to discharge a retained attorney is, however, not absolute. [Citation.] The trial court has discretion to "deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]."'" (*O'Malley*, at p. 1004; accord, *Verdugo*, at p. 311; see *Gonzalez-Lopez*, *supra*, 548 U.S. at p. 152 [recognizing "trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness" and "the demands of its calendar"].) "In this context, while 'a defendant seeking to discharge his retained attorney is not *required* to demonstrate inadequate representation or an irreconcilable conflict, this does not mean that the trial court cannot properly consider the absence of such circumstances in

14

deciding whether discharging counsel would result in disruption of the orderly processes of justice.'" (*O'Malley*, at p. 1004; accord, *People v. Maciel* (2013) 57 Cal.4th 482, 513 (*Maciel*).)

"'[T]hough it is clear that a defendant has no *absolute* right to be represented by a particular attorney, still the courts should make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney.'" (*Woodruff, supra*, 5 Cal.5th at p. 728; accord, *People v. Williams* (2021) 61 Cal.App.5th 627, 631 ["while a criminal defendant's right to counsel of choice is not absolute, that right may be overridden only under narrow, compelling, and specifically delineated circumstances"].) The erroneous deprivation of a defendant's right to counsel of choice is structural error requiring automatic reversal. (*Gonzalez-Lopez, supra*, 548 U.S. at p. 150; *Woodruff*, at p. 728.)

3. *The trial court abused its discretion*

Frias contends the trial court abused its discretion in denying his June 23, July 19, August 25, and November 30, 2021 requests to substitute in Castaneda and Yim of the Castaneda firm as Frias's counsel. We agree the trial court abused its discretion in denying Frias's November 30, 2021 request to substitute in Yim and the Castaneda firm notwithstanding the court's concerns that the request was a delay tactic and Yim would not be ready for trial.

In June 2021 when Frias first requested substitution of Castaneda as his counsel, the case had been pending for more than three years. Although some of the trial delay was attributable to the COVID-19 pandemic and the six-month delay to assess Frias's competence to stand trial, it was reasonable for

15

the trial court to attribute a significant portion of the delay to Frias's repeated substitution requests. Frias was represented at the preliminary hearing in May 2018 by deputy public defender Graves. The trial court granted Frias's first four requests to substitute in new counsel: (1) on October 25, 2018 to substitute retained attorney Melnick; (2) on August 23, 2019 to substitute the public defender's office (Cox); (3) on November 4, 2019 to substitute retained attorney Gordon; and (4) on December 3, 2020 to substitute retained attorney Cargal. And, after Cargal requested to be relieved as counsel (asserting Frias was making it difficult to represent him), on January 4, 2021 the court granted Frias's request to reappoint Cox. Each time the court granted Frias's request, the court raised its concern that Frias's repeated requests for new counsel were made for the purposes of delay.

The trial court did not abuse its discretion in denying Frias's three requests in June, July, and August 2021 to substitute in the Castaneda firm. When Frias sought to have Castaneda substitute in as counsel on June 23, 2021, Castaneda stated "there would be no further delays" because he was "not asking for any additional time." But Castaneda acknowledged he had reviewed only some of the discovery (having received the record from Cox an hour before the hearing), and when asked whether he would be ready within the time period for trial (20 days), Castaneda admitted he would not. When Yim sought to substitute in as counsel on July 19, 2021, he stated the law firm had "been in communication with" Cox and did not intend to cause further delay. However, Yim never stated whether he could be ready by August 4, 2021, the date the court set as zero of 20 for trial. And on August 25, 2021 Cox informed the court that

16

Yim was present in court and Frias wanted to substitute in Yim as counsel. But Yim did not address the court or explain whether he would be ready for trial.

However, the trial court abused its discretion in denying Frias's request to substitute in Yim as counsel on November 30, 2021. The court was rightly concerned that another attorney substitution—following four prior substitutions—could further delay the trial and was made by Frias for that purpose. But Yim represented for the first time that he was ready for trial and was not seeking a trial continuance. By this time, the Castaneda firm (1) had sought to substitute in for the prior five months; (2) had possession of the entire digital file from Cox during that five-month period; and (3) had been in communication with Cox, who "tried to ensure" retained counsel could "hit the ground running."

The People contend Yim was equivocal about his readiness for trial because Yim stated he was "ready for trial, subject to the scheduling that was discussed with the experts and things like that." But Yim added that "it sounds like everything got addressed," acknowledging that the prosecutor and Cox had resolved Cox's concerns over the availability of the police officers for trial. And by the time Frias requested Yim be substituted in as counsel on November 30, Cox and the prosecutor had worked out the issues relating to testimony by the defense experts. Further, any trial delay that would have resulted from unavailability of the officers or defense experts would have affected the defense's readiness for trial regardless of whether Cox or Yim represented Frias.

The prosecutor and trial court had a legitimate concern based on the history of the case that, notwithstanding Yim's representation he was not seeking a continuance, Yim might

17

request a continuance once he substituted in as counsel and finished his preparation for trial. But nothing in the record as of November 30 showed Yim's statement that he was ready for trial was not credible. Nor did the court make any inquiries of Yim to discern whether he was in fact ready, for example, holding an in camera hearing (as Cox had proposed) to inquire into whether Yim was ready to call his witnesses on the trial date. Further, the court retained discretion to deny a future continuance request given Yim's assurances that he was ready for trial. Likewise, the court could deny a future request by Frias for yet another substitution of counsel. The *possibility* of future delay did not warrant denial of Frias's right to counsel of his choice "based on considerations of judicial efficiency." (*Courts, supra*, 37 Cal.3d at pp. 794-795 [trial courts must "exercise 'resourceful diligence' in protecting the right to chosen counsel . . . even when a byproduct of a concrete and timely assertion of that right is some disruption in the process"].)

*Courts* is instructive. In *Courts*, two months before trial a defendant charged with murder met with a private attorney in an effort to replace his appointed counsel, but the defendant did not yet have the funds to pay the attorney's retainer fee. (*Courts, supra*, 37 Cal.3d at pp. 787-788.) A week before the trial date, the deputy public defender told the court that the defendant wanted a continuance to hire private counsel; the court denied the request, finding it was untimely. (*Ibid*.) On the day of trial, the defendant renewed his request, explaining in a declaration that he did not have confidence in his deputy public defender who had not previously tried a case of that magnitude. (*Id*. at p. 789.) The trial court (a second judge) denied the request. (*Id*. at pp. 788-789.) The Supreme Court reversed the judgment,

18

explaining "'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.'" (*Id*. at p. 791.)

Here too, the trial court abused its discretion by insisting that the case proceed to trial with Cox—based on the court's perception that Cox was best prepared to handle the case, describing him as "fully prepared" given the "massive" amount of work he had done on the *Pitchess* motion, supplemental *Pitchess* discovery, and expert reports. By focusing on Cox's preparation for trial instead of Yim's representation that he was ready for trial, the trial court, as in *Courts*, improperly focused on the efficiency of proceeding to trial at the expense of Frias's constitutional right to be represented at trial by counsel of his choice.

The Supreme Court cases relied on by the People, finding no abuse of discretion in denying the defendants' untimely motions to substitute new counsel, are distinguishable because in each case substitution would have significantly delayed the trial. In *Maciel, supra*, 57 Cal.4th at pages 510 to 511, the trial court granted the defendant's first two requests to substitute in retained counsel but denied the defendant's third request made after the case was pending for two years, explaining it would take at least six months for a new attorney to prepare for trial. The Supreme Court reasoned in finding no abuse of discretion, "At the time the motion was made, the case had been pending for two years. Trial was imminent and, in fact, began about six weeks later. Defendant had no substitute counsel in mind; rather, he requested that the court appoint counsel. . . . In evaluating timeliness, the trial court properly considered the long delay that would have resulted from changing counsel in this case. The trial

19

court, which had been through at least one trial of the former codefendants, expressed concern that further delay would exacerbate the witnesses' reluctance to testify. The trial court also noted the absence of abandonment or inadequate representation by counsel or an actual conflict of interest." (*Id.* at pp. 512-513.) The Supreme Court concluded the trial court "reasonably denied defendant's motion because relieving counsel under these circumstances would have resulted in the "'disruption of the orderly processes of justice."'" (*Id.* at p. 513; see *O'Malley, supra*, 62 Cal.4th at pp. 1006-1007 ["The court likely would have been well within its discretion to deny such a request [to discharge counsel], given that it would have come in the midst of defendant's penalty phase case and without any substitute counsel at hand."]; *Verdugo, supra*, 50 Cal.4th at p. 311 [no abuse of discretion in denying motion to discharge counsel made in the middle of an evidentiary hearing on motion for new trial where new counsel would need significant time to study lengthy trial record and witnesses' memories would likely fade over time given that a year had already passed since trial].)[8]

Unlike *Maciel*, *O'Malley*, and *Verdugo*, in which the defendants sought to discharge their attorneys but had not

---

[8] *People v. Keshishian* (2008) 162 Cal.App.4th 425, relied on by the trial court, is similarly distinguishable. There, the defendant requested a continuance to hire new attorneys on the day set for trial after the case had been pending for two-and-a-half years. (*Id.* at p. 428.) As the Court of Appeal explained in affirming the trial court's denial of the request, "An indefinite continuance would have been necessary, as appellant had neither identified nor retained new counsel. Witnesses whose appearances had already been scheduled would have been further inconvenienced by an indefinite delay." (*Id.* at p. 429.)

identified substitute counsel, and new counsel would need significant time to prepare for trial, Frias retained the Castaneda firm five months before trial, and Yim declared he was ready for trial. Further, in *Maciel* and *Verdugo*, the trial courts were concerned the delay would impact the willingness of the witnesses to appear (*Maciel*) or their ability to recall the underlying events (*Verdugo*). (See *Maciel, supra*, 57 Cal.4th at pp. 511, 513; *Verdugo, supra*, 50 Cal.4th at p. 311.) Although Frias contributed to the trial delay by discharging appointed counsel (Graves) and three retained counsel (Melnick, Gordon, and Cargal), there was no showing that substitution of the Castaneda law firm on November 30, 2021 would cause any further delay or impact witness testimony. On this record, the trial court abused its discretion in denying Frias his right to counsel of his choice.

Because the erroneous deprivation of Frias's right to counsel of choice is a structural error, we reverse. (*Gonzalez-Lopez, supra*, 548 U.S. at p. 150; *Woodruff, supra*, 5 Cal.5th at p. 728.)

Although we reverse the judgment, we consider Frias's challenge to the sufficiency of the evidence to determine whether he can be tried again for stalking. (*People v. Morgan* (2007) 42 Cal.4th 593, 613 ["Although we have concluded that the kidnapping conviction must be reversed because it was presented to the jury on both a legally adequate and a legally inadequate theory, we must nonetheless assess the sufficiency of the evidence to determine whether defendant may again be tried for the kidnapping offense."]; *People v. Hayes* (1990) 52 Cal.3d 577, 631 ["Although we have concluded that the robbery conviction must be reversed for instructional error, we must nonetheless

assess the sufficiency of the evidence to determine whether defendant may again be tried for this offense."]; *People v. Jones* (2018) 26 Cal.App.5th 420, 437; see *People v. Story* (2009) 45 Cal.4th 1282, 1295 ["'an appellate ruling of legal insufficiency is functionally equivalent to an acquittal and precludes a retrial'"].)

B.     *Substantial Evidence Supports the Stalking Conviction*
       1.     *Standard of review*
       "When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court.  We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142 ["'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.'"].) "'"Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence."'" (*Penunuri,* at p. 142; accord, *People v. Mendez* (2019) 7 Cal.5th 680, 703.)
       "'"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence."'" (*People*

*v. Vargas, supra*, 9 Cal.5th at p. 820; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 324.) "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; accord, *People v. Penunuri, supra*, 5 Cal.5th at p. 142 ["'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'"].)

2.      *Governing law*

Stalking is established if the defendant (1) repeatedly followed or harassed another person; (2) made a credible threat; and (3) did so with the intent to place that person in reasonable fear for his or her safety. (*People v. Peterson* (2023) 95 Cal.App.5th 1061, 1065-1066; *People v. Bleich* (2009) 178 Cal.App.4th 292, 301; see § 646.9, subd. (a) ["Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking . . . ."].)

Under section 646.9, subdivision (e), a person "'harasses'" a person by engaging "in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." A "'course of conduct'" means "two or more acts

23

occurring over a period of time, however short, evidencing a continuity of purpose." (*Id.*, subd. (f).) And a "'credible threat'" is defined as "a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (*Id.*, subd. (g).) (See *People v. Peterson, supra*, 95 Cal.App.5th at p. 1066; *People v. Cruz* (2020) 46 Cal.App.5th 715, 732 ["Stalking requires the defendant to willfully make a 'credible threat' with the intent to place the victim in reasonable fear for the victim's safety or for the safety of the victim's immediate family."].)

> 3. *Substantial evidence supports the jury's findings Frias made a credible threat and intended to place Courtney in reasonable fear for her safety*

Frias contends substantial evidence does not support the jury's findings he made a credible threat and acted with the specific intent to place Courtney in reasonable fear for her safety.[9] Substantial evidence supports Frias's stalking conviction.

---

9 Frias does not challenge the sufficiency of the evidence with respect to the first element for stalking that a person "willfully,

24

The facts in this case—where a defendant pursues a victim in the hope of a romantic relationship and continues the pursuit after the victim makes clear the conduct is unwanted (placing the victim in fear)—are similar to those the Courts of Appeal found sufficient to support stalking convictions in *People v. Lopez* (2015) 240 Cal.App.4th 436 (*Lopez*) and *People v. Uecker* (2009) 172 Cal.App.4th 583 (*Uecker*). In *Lopez*, defendant Cesar Lopez and Angie Rizzo were acquaintances when she was 16 years old, but when Lopez started acting romantically toward Rizzo, she avoided his calls and stopped responding to his emails. Lopez then sent packages to Rizzo at her mother's address for five or six years. (*Lopez*, at pp. 438-439.) When Rizzo was 26 years old, Lopez began sending her Facebook messages, one of which included a picture of a labyrinth made of small rocks in the image of Rizzo's face. Rizzo recognized the location of the labyrinth, which was about five blocks from her home; when she saw the labyrinth, she became "'very scared.'" (*Id.* at pp. 439-440.) Rizzo sent Lopez a Facebook message asking him to stop contacting her. In response, Lopez asked her to dress in white to perform a ceremony with him at the labyrinth. (*Id.* at p. 441.) Rizzo called the police, who warned Lopez to stop contacting Rizzo. (*Id.* at p. 442.) Rizzo confirmed with a police sergeant "that she did not believe [Lopez] would harm her and he had never threatened her." (*Ibid.*) Lopez continued to send Rizzo letters, created blogs about her, and approached her on four occasions. (*Id.* at p. 443.)

The *Lopez* court concluded that even absent any overt threats, Lopez's course of conduct constituted a credible threat

maliciously, and repeatedly follows or willfully and maliciously harasses another person." (§ 646.9, subd. (a).)

25

within the meaning of section 646.9, subdivision (g). (*Lopez, supra*, 240 Cal.App.4th at p. 453.) The court reasoned, "[Lopez's] construction of the labyrinth, the content of his blogs, messages, letters and packages, and the persistence with which he contacted Rizzo despite being told to stop by her and by the police, reveal an obsession that a reasonable person would understand as threatening." (*Id.* at pp. 453-454, fn. omitted.) The court continued with respect to Lopez's intent to scare Rizzo, "[Lopez's] persistence in the face of Rizzo's efforts to avoid him and make him understand the degree of fear he was causing her, including going to the police to stop him, amply supports the inference that he intended the result he caused." (*Id.* at p. 454.)

In *Uecker, supra*, 172 Cal.App.4th 583, as to victim M., over a seven-month period Danny Uecker sat near M.'s car at her workplace parking lot during M.'s lunch hour, left notes on her car stating he wanted a relationship with her, and tried to engage her in conversation. (*Id.* at p. 586.) Uecker continued to approach M. and leave her notes even after she moved her car to a different parking location and took lunch at a different hour. (*Id.* at pp. 586-587.) In one note, Uecker commented that he liked her new car better than her prior one, which "terrified" M. because she had just bought a new car the previous week. (*Id.* at p. 587.) M. again changed her parking location out of fear and told Uecker she was not interested in him. (*Ibid.*) After Uecker continued to leave her notes, M. "'freaked out,'" and her manager called the police. (*Id.* at p. 588.)

The Court of Appeal concluded there was substantial evidence that Uecker made a credible threat because over the seven-month period he had followed M. and placed notes on her car, regardless of when she took her lunch hour or where she had

26

parked her car, and even after M. told him she was not interested. (*Uecker, supra*, 172 Cal.App.4th at pp. 594-595.) The court explained, "From this evidence, a reasonable jury could have found that [Uecker] made an implied threat to [M.'s] safety in that he was going to do whatever he needed to get M. to go out with him and that she reasonably feared for her safety." (*Id.* at p. 595.)

Substantial evidence supports the jury's finding Frias made a credible threat to Courtney. In 2017 Frias began to send Courtney messages on her Facebook account, which she blocked about 10 times, but he persisted in contacting her. By the summer of 2017, Frias posted on her account every couple of weeks. It became clear to Courtney that Frias was watching her because in February 2018 he posted a comment about the flowers she placed in a vase by her third-floor apartment window, and in March he commented on her hair, her movie watching, and her attire. Despite Courtney's repeated efforts to block Frias from contacting her on Facebook, Frias continued to send her messages, noting his "deep connection" with her and ending one message by stating, "Till we meet again." Courtney was "really scared" by Frias's messages. More than seven months after Frias started sending Courtney messages, on March 10, 2018 Frias appeared at Courtney's apartment door in the middle of the night and directed her to open her door so he could "'get this over with.'" Courtney told Frias she was calling the police, and he left, but an hour later he sent Courtney another message stating their last contact at her apartment was an "awesome start" and he couldn't "fucken stop." And three days after Courtney called the police, Frias returned to her apartment complex and sent a text message to Amanda (thinking it was Courtney) to meet him

27

downstairs to "'suck this dick.'" As in *Lopez* and *Uecker*, Frias's persistent contact with Courtney after she attempted to block his messages, his watching her through her apartment window and appearing at her apartment door, and then showing up at her apartment complex even after she told him she was calling the police, "signaled he was not going to take no for an answer." (*Uecker, supra*, 172 Cal.App.4th at p. 595; see *Lopez, supra*, 240 Cal.App.4th at pp. 453-454.)

Substantial evidence also supports the jury's finding that Frias intended to place Courtney in reasonable fear for her safety. "'"[T]he element of intent is rarely susceptible of direct proof and must usually be inferred from all the facts and circumstances disclosed by the evidence."'" (*Lopez, supra*, 240 Cal.App.4th at p. 454; accord, *People v. Falck* (1997) 52 Cal.App.4th 287, 299.) In February 2018 Frias apologized to Courtney for having "spooked [her] in any way at all" by his messages, but he continued to send messages to Courtney professing his love, made clear he was watching her, went to her apartment in the middle of the night, and returned to her apartment complex (and sent a sexually explicit text message to her) even after she made clear by calling the police that his conduct was unwanted and scared her. A reasonable jury could infer from Frias's course of conduct "that he intended the result he caused." (*Lopez*, at p. 454; see *Uecker, supra*, 172 Cal.App.4th at p. 595 ["a reasonable jury could conclude defendant wanted M. to know he had been watching her while she was parked at work and keeping track of her schedule to place her in fear of her safety"]; *Falck*, at p. 299 ["Here, it can be inferred that appellant intended to cause fear in the victim from the fact [among others] that he insisted on maintaining contact with [the victim]

although she clearly was attempting to avoid him, and although he had been warned away by the police, the court and the victim's husband."].)

## DISPOSITION

The judgment is reversed. The case is remanded for a new trial.

FEUER, Acting P.J.

We concur:

MARTINEZ, J.

EVENSON, J.*

---

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.